**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **ADYA LLC (D/B/A SMARTCARERX)**, <br><br> Plaintiff, <br><br> v. <br><br> **U.S. DRUG ENFORCEMENT ADMINISTRATION**, *et al.*, <br><br> Defendants. |

Case No. 1:26-cv-141 (TNM)

**<u>MEMORANDUM ORDER</u>**

Adya LLC, known to its customers as SmartCareRx, is an Orlando-based pharmacy that has served hundreds of customers during its five years in operation.  Things changed quickly last December when the U.S. Drug Enforcement Administration issued an Immediate Suspension Order ("ISO") revoking SmartCareRx's registration to dispense controlled substances.  No longer able to order or pick up prescriptions there, many physicians and customers have since looked elsewhere.  SmartCareRx sought more information from the DEA about the basis for the revocation but never heard back.  It offered to cease dispensing the three controlled substances at issue in the ISO, but again, never heard back.  Worse, the DEA has not held a hearing that governing law promises SmartCareRx.  Worst, the DEA offers no sense of when that hearing may happen.

These circumstances drove SmartCareRx to this Court.  It seeks a preliminary injunction stopping the enforcement of most of the DEA's ISO until there is a final determination on the matter.  It argues that the DEA: (1) arbitrarily and capriciously revoked its registration; and (2) violated its Fifth Amendment right to due process in failing to hold a hearing.  Because the DEA

inadequately explained the basis for revoking the registration and has not, three months later, held (or even scheduled) a hearing, SmartCareRx is likely to succeed on these claims. SmartCareRx has also shown that irreparable harm, the balance of hardships, and public interest tilt in its favor.

For these reasons, the Court grants SmartCareRx a narrowly tailored preliminary injunction.  It affects only controlled substances other than the three at the core of the DEA's revocation and will dissolve as soon as the DEA issues a final determination.

## I.

SmartCareRx opened its doors in 2021 and has since provided its Orlando customers with numerous prescription medications.  Am. Compl. ¶¶ 20, 22, ECF No. 17; Thumu Decl. ¶ 1, ECF No. 23-3.  Because many of those prescriptions involve controlled substances, Am. Compl. ¶ 4; Thumu Decl. ¶ 3, the Controlled Substances Act and its implementing regulations govern SmartCareRx's operations.  21 U.S.C. §§ 801 *et seq.*; 21 C.F.R. §§ 1300 *et seq.*

The Act requires pharmacies that want to manufacture, prescribe, and distribute controlled substances to obtain and maintain a registration issued by the DEA Administrator. *See* 21 U.S.C. § 822(a); 28 C.F.R. § 0.100.[1]  Pharmacies' obligations do not end there.  After a pharmacy obtains a valid registration, its pharmacists shoulder a "corresponding responsibility" to ensure the controlled substance prescriptions they fill are "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." *See* 21 C.F.R. § 1306.04.

The DEA "closely observes" pharmacies and other registrants to ensure their compliance

---

[1]  The Act assigned the Attorney General registration authority, *see* 21 U.S.C. § 822(a), but she has delegated this authority to the Administrator, *see* 28 C.F.R. § 0.100.

with its regulations and to protect public health and safety. *See Masters Pharm., Inc. v. DEA*, 861 F.3d 206, 212 (D.C. Cir. 2017). To that end, the Controlled Substances Act permits the DEA to suspend a pharmacy's registration to dispense controlled substances if necessary. *See* 21 U.S.C. § 824(a). To revoke a registration, the DEA must serve a show cause order. 21 U.S.C. § 824(c)(1)–(2). Normally, that order gives the registrant a chance to show why its registration "should not be denied, revoked, or suspended" before the revocation occurs. *Id.* § 824(c)(1).

Governing regulations also promise the registrant a hearing where the DEA bears the burden of persuading an administrative law judge ("ALJ") that the registration is inconsistent with the public interest. *See* 21 C.F.R. §§ 1301.36(d), 1301.42, 1301.44(e). Only once the ALJ issues a recommendation does the DEA make a final determination on the registration. 5 U.S.C. §§ 556(c)(10), 557; 21 C.F.R. § 1301.46. Any judicial review of that decision occurs in a circuit court. 21 U.S.C. § 877.

But sometimes public health and safety demand faster action. If the DEA Administrator finds that a pharmacy's activity poses an "imminent danger to the public health or safety," he may immediately suspend that pharmacy's registration before any hearing occurs. 21 U.S.C. § 824(d); *see also* 21 C.F.R. § 1301.36(e). An "imminent threat," according to the Act, is one that poses a "substantial likelihood of an immediate threat that death, serious bodily harm, or abuse of a controlled substance will occur . . . ." 21 U.S.C. § 824(d)(2). When the DEA finds that pharmacy activity meets this bar and issues an ISO to stop the threat, DEA regulations promise a "prompt" post-deprivation hearing at the pharmacy's request. *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 229 (D.D.C. 2012); *see* 21 C.F.R. § 1301.36(h). Typically, the ISO remains in place until those administrative proceedings conclude. 21 U.S.C. § 824(d)(1).

This backdrop sets the scene for SmartCareRx's case. The DEA investigated

SmartCareRx for about a year starting in spring 2024. Am. Compl. ¶ 2. In late December (several months after closing the investigation), the DEA served SmartCareRx with an ISO. Suspension Order at 2, ECF No. 23-2. The Order alleged that SmartCareRx failed to "comply with the obligations of a registrant in the dispensing of controlled substances." *Id.* at 8. The DEA elaborated that SmartCareRx had allegedly dispensed hundreds of prescriptions for various controlled opioids to about forty fictitious patients. *Id.* at 4–7. Those findings, the Order explained, showed "imminent danger" from the pharmacy's activity and warranted suspension of its registration "effective immediately" with a hearing to come later. *Id.* at 8. The DEA simultaneously raided SmartCareRx to seize its controlled substances. Am. Compl. ¶¶ 24, 27.

About a month later, SmartCareRx requested a hearing with the DEA. *Id.* ¶ 30. The same day, SmartCareRx moved this Court for a temporary restraining order that would stop the enforcement of the ISO for the duration of administrative proceedings. *See* Compl., ECF No. 1; Mot. for TRO, ECF No. 5. At SmartCareRx's request, the Court held that motion in abeyance pending preliminary injunction briefing, *see* Minute Entry, January 21, 2026, and eventually denied it as moot once SmartCareRx amended its Complaint, *see* Am. Compl.; Minute Order, February 23, 2026.[2] SmartCareRx has since re-moved for a preliminary injunction. *See* Pl.'s Renewed Mot. Prelim. Inj. ("Pl.'s Mot."), ECF No. 23-1. The DEA opposed, *see* Defs.' Opp'n Renewed Mot. Prelim. Inj. ("Defs.' Opp'n"), ECF No. 26, and the Court heard argument. *See* Minute Entry, March 13, 2026. That motion is now ripe.

**II.**

Before considering the merits of the preliminary injunction, the Court must assure itself

---

[2] SmartCareRx's Amended Complaint names as defendants the DEA, DEA Administrator Terrance C. Cole, the Department of Justice, and Attorney General Pamela Bondi. Am. Compl. ¶¶ 7–10. This Memorandum Order refers to them collectively as "the DEA."

of its jurisdiction to do so. *See Alphabet Workers Union-Commc'n Workers of Am.*, *Loc. 9009 v. NLRB*, 134 F.4th 1217, 1224 (D.C. Cir. 2025). The key issue on this score is whether Congress has foreclosed district courts from hearing this kind of case.

Generally, federal district courts may hear challenges to federal agency actions through 28 U.S.C. § 1331's jurisdictional grant for claims "arising under" federal law. This case presents a few questions of federal law. SmartCareRx's claims against the DEA arise under the Administrative Procedure Act, the Constitution's Fifth Amendment, and the Controlled Substances Act. *See* Am. Compl. ¶ 11. Normally, by resting its claims on three federal laws, SmartCareRx would leave no question about this Court's jurisdiction under 28 U.S.C. § 1331.

But sometimes, Congress creates special statutory review schemes that preclude district courts' review. *See Axon Enter. v. FTC*, 598 U.S. 175, 185 (2023). Take the Clean Air Act, which "enumerates seven categories of EPA actions for which review lies directly and exclusively in the federal courts of appeals." *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 114 (2018); 33 U.S.C. § 1369(b)(1). Or consider the Mine Act, which places "exclusive" jurisdiction over Mine Safety Commission decisions in the appellate courts. *See Thunder Basin Coal Co. v. Reich,* 510 U.S. 200, 208 (1994); 30 U.S.C. § 816(a)(1). The parties dispute whether this case is like those. The Court thinks not and finds jurisdiction over this matter proper.

Start with § 824(d). Recall that this part of the Controlled Substances Act governs the suspension orders the DEA issues immediately, without first conducting a hearing. 21 U.S.C. § 824(d). The DEA may do so only upon a finding of "imminent danger to the public health or safety," which the statute defines as a "substantial likelihood of an immediate threat that death, serious bodily harm, or abuse of a controlled substance will occur in the absence of an immediate suspension of the registration." *Id.*

Aside from granting the DEA revocation authority and defining "imminent danger," § 824(d) also defines the lifespan of an ISO. Such orders "shall continue in effect" during administrative proceedings and judicial review of them "unless sooner withdrawn by the Attorney General or *dissolved by a court of competent jurisdiction*." *Id.* § 824(d)(1) (emphasis added). In setting that timeline, § 824(d) unmistakably acknowledges some courts' ability to cancel ISOs before a final determination on the registration revocation. *See Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 829 (5th Cir. 1976). The DEA concedes that at least "some court has the authority under [§] 824(d) to hear this now," before the DEA issues a final ruling. PI Hr'g Tr. at 22:6–22:8, 22:24–23:01.

The question, then, "really devolves" into "whether a district court, and not a court of appeals, can be a 'court of competent jurisdiction'" under this provision. *Novelty Distribs., Inc. v. Leonhart*, 562 F. Supp. 2d 20, 24 (D.D.C. 2008) (quoting 21 U.S.C. § 824(d)(1)). Normally, the "default rule" is that "persons seeking review of agency action go first to district court rather than to a court of appeals." *Loan Syndications & Trading Ass'n v. SEC*, 818 F.3d 716, 719 (D.C. Cir. 2016) (cleaned up). Direct review by appellate courts occurs "only when authorized by a specific direct-review statute." *Id.* (cleaned up).

That is why, for instance, the D.C. Circuit transferred an action to the district court in a case seeking review of a Whistleblower Act complaint that the Secretary of Defense rejected. *Rodriguez v. Penrod*, 857 F.3d 902, 905 (D.C. Cir. 2017); *see* 10 U.S.C. § 1034(h). The plaintiff in that case appealed the Secretary's decision directly to the D.C. Circuit, but nothing in the Act "provid[ed] for direct review in the courts of appeals" or otherwise addressed which court had jurisdiction to review the agency action. *Rodriguez*, 857 F.3d at 906. The Act's silence meant that the "default rule of district court jurisdiction applie[d]." *Id.* Indeed, the D.C. Circuit

6

emphasized that unless Congress "*expressly* suppli[es] the courts of appeals with jurisdiction to review agency action directly," the challenge "falls within the general federal question jurisdiction of the district court and must be brought there ab initio." *Id.* (cleaned up).

Section 824(d) operates similarly. Nothing in this provision limits "competent" courts to circuit courts when it comes to review of ISOs. *See* 21 U.S.C. § 824(d). The only mention of courts or judicial review of any sort in subsection (d) is the language quoted above. More, the benefits of direct review in the appellate courts do not apply for emergency motions like this one. While "initial review of agency actions in the courts of appeals often makes good sense," that is because, "typically," an agency has by then compiled a complete record. *Loan Syndications*, 818 F.3d at 719 (cleaned up). More, at that point, "appeals are all but guaranteed," so "district court review may only add delay and expense." *Id.* (cleaned up). This case, which comes to the Court in an emergency posture, has no administrative record and would face more delay from a three-member panel than a single-judge district court. The "strictly limited" extent of appellate court jurisdiction under direct review statutes demands the Court stick to the default here. *See NetCoalition v. SEC*, 715 F.3d 342, 348 (D.C. Cir. 2013).

The DEA's arguments to the contrary are unconvincing. After suggesting in its brief that no court could review ISOs, *see* Defs.' Opp'n at 13–14, at oral argument it proposed instead that 21 U.S.C. § 877 allows appellate courts to review them, PI Hr'g Tr. at 21:12–22:05. As its counsel admitted, no court has *ever* adopted this position, while the Fifth Circuit and a smattering of district courts have found that § 824(d) motions belong in district courts. *See* PI Hr'g Tr. at 23:10–23:11 (stating that the DEA is "not aware of a case where an ISO has been directly appealed to a circuit court."); *see also Norman Bridge*, 529 F.2d at 829; *Novelty*, 562 F. Supp. 2d at 27; *Neil Lab'ys, Inc. v. Ashcroft*, 217 F. Supp. 2d 80, 87 (D.D.C. 2002).

Section 877 does not divest this Court of jurisdiction here.  That section states that "any person aggrieved by" DEA "final determinations" in Controlled Substance Act cases "may obtain review of the decision in the United States Court of Appeals for the District of Columbia or for the circuit" home to the relevant business.  21 U.S.C. § 877.  As other courts have concluded, and as this one agrees, § 877 sends appeals of *final* DEA determinations directly to circuit court.  *See John Doe, Inc. v. DEA*, 484 F.3d 561, 568 (D.C. Cir. 2007) (collecting cases); *see also, e.g.*, *Hemp Indus. Ass'n v. DEA*, 539 F. Supp. 3d 120, 132 (D.D.C. 2021).

But "final determinations" are a separate matter from the ISOs at issue in § 824(d).  As the parties agree, ISOs last only until a final determination and "judicial review thereof" occurs.  Defs.' Opp'n at 15 ("[T]he Suspension Order is not a final determination."); Pl.'s Reply at 4, ECF No. 28 ("The ISO is not a final decision that would trigger [§] 877."); PI Hr'g Tr. at 20:19–20:20 ("The [DEA] also agrees there is not a final determination."); PI Hr'g Tr. at 5:25–6:06 (describing SmartCareRx's view of the Order as a "preliminar[y] finding that is in effect until a final determination is reached").  Thus ISOs do not fall within § 877's reach.

The DEA's other arguments against jurisdiction confuse the issues.  It pitches SmartCareRx as arguing that the ISO is final for purposes of APA review, yet not a final determination triggering 21 U.S.C. § 877.  *See* Defs.' Opp'n at 14.  If correct, SmartCareRX would have a problem.  The D.C. Circuit has rejected this very assertion as "implausible."  *Doe*, 484 F.3d at 568 (suggesting that in most appeals from DEA decisions, a "final agency action" under the APA is also a "final determination" under § 877).  But SmartCareRx mounts only half of that argument.  True, SmartCareRx (like the DEA) claims the ISO was not a "final determination" under § 877.  Pl.'s Reply at 4.  But it never argues that the ISO is simultaneously a final agency action for APA purposes.  It argues instead that 21 U.S.C. § 824(d) renders the

ISO reviewable under the APA even if it is not final. *See id.* at 5. And as the Court will discuss below, *see infra* Section III.A.iii., it agrees with that view. SmartCareRx thus never collides with the obstacle the DEA sees.

To be clear, SmartCareRx's view on finality comports with the D.C. Circuit opinion in *John Doe.* 484 F.3d 561. *Doe* concerned a drug manufacturer's appeal from the DEA's denial of a drug importation permit. *Id.* at 56. In deciding the permit denial was final, the D.C. Circuit focused on whether a DEA's decision was "definitive" or subject to "change in further administrative proceedings." *Id.* at 566. It concluded that the DEA's permit denial ruling *was* definitive and would *not* change, confirming its status as final. *Id.*

Not so here. The ISO is a "preliminar[y] finding," PI Hr'g Tr. at 6:03, and the DEA has no sense of whether it will affirm or abandon the ISO after a hearing, *see id.* at 43:15–44:20. And even though the ISO had a "direct and immediate effect" on SmartCareRx's business like the denial in *Doe*, *see* 484 F.3d at 567 (cleaned up), this lone feature does not render the otherwise "tentative" decision final, *see Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) (explaining that "an agency's action is not necessarily final merely because it is binding" if that action does not also "finally decide the case").

Despite its recognition that SmartCareRx's suspension is "not a final determination" unlike the order in *Doe*, Defs.' Opp'n at 15, the DEA contends that "the logic of *Doe*" still applies and bars this Court's jurisdiction, PI Hr'g Tr. at 26:23. To map that case onto this one, the DEA embraces the *Doe* court's concerns about forum-shopping and "potentially conflicting review" that could arise if district courts also had jurisdiction over the final determination at issue there. *Doe*, 484 F.3d at 570 (cleaned up). The DEA takes that hesitation and runs with it. It warns that if this Court has subject-matter jurisdiction over SmartCareRx's case, courts

reviewing "non-final order[s]" could be "different" from those reviewing final determinations, and "final action [could] happen while [a] case is still being heard in the district court." PI Hr'g Tr. at 24:13–24:18.

These overblown fears ignore the differences between this case and *Doe*. In *Doe*, the parties disputed a final DEA determination, which under § 877, rendered review appropriate only in an appellate court. Here, the DEA has not provided a final decision, just a preliminary one. Review of that interim decision properly occurs in this Court. 21 U.S.C. § 824(d). If and when the DEA produces a final determination, any appeal then goes to the appellate court. *Id.* § 877. At that point, the preliminary decision no longer "continue[s] in effect." *Id.* § 824. Nowhere in this process do courts compete for jurisdiction.

The bottom line is this Court's jurisdiction is proper.

### III.

Assured of its jurisdiction, the Court now turns to the substance of the preliminary injunction motion. A preliminary injunction is "an extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (cleaned up). The movant must surmount a high bar and establish four factors by "a clear showing": First, that it is likely to succeed on the merits; second, that it will likely suffer irreparable harm in the absence of injunctive relief; third, that the balance of equities favors granting the relief; and fourth, that the public interest favors the injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008). Where, as here, the government is the party opposing injunctive relief, the latter two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The Court evaluates each factor in turn, starting with SmartCareRx's likelihood of success on the merits of its two claims: (1) that the ISO amounted to an arbitrary and capricious

decision; and (2) that the DEA violated its Fifth Amendment right to procedural due process.

## A.

### i.

First up is SmartCareRx's arbitrary and capricious claim—that the DEA unlawfully issued the ISO. The APA instructs courts to set aside agency actions they find "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A few principles guide this Court's inquiry. First, an agency acts arbitrarily and capriciously when it "refus[es] to consider evidence bearing on the issue before it" or ignores "evidence contradicting its position." *Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010). This requirement of "[r]easoned decisionmaking is not a procedural requirement" but "stems directly from § 706 of the APA." *Id.* at 195.

Second, "[t]he requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result." *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993). Agencies need not supply "an essay" explaining each of its decisions. *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1224 (D.C. Cir. 1999) (cleaned up). "It suffices, in the usual case, that [courts] can discern the why and wherefore." *Id.* (cleaned up).

The DEA's decision likely has not met these requirements. Recall that to issue ISOs, the DEA must find that an "imminent danger" to the public justifies revoking the relevant registration before a hearing. 21 U.S.C. § 824(d). As SmartCareRx sees things, the DEA failed to adequately support its "imminent danger" finding.

SmartCareRx is correct. For one, the DEA wrapped up its SmartCareRx investigation over four months before serving the ISO. Am. Compl. ¶ 2; Suspension Order at 3. Nowhere in the Order, or anywhere else, does the DEA explain why this supposedly imminent danger could

11

stand a four-month delay yet remain imminent enough to warrant an immediate, pre-hearing suspension. *See Norman Bridge*, 529 F.2d at 829 (affirming a temporary restraining order of an ISO where the "alleged discrepancies in the drugstore records had been known for approximately seven months" before the issuance of an ISO and the DEA never explained the delay).

For another, the ISO's summary of the DEA investigation "list[s] . . . facts and state[s] its conclusions," but it fails to "connect them" in a "rational way." *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1407 (D.C. Cir. 1995). The Order recounts that on March 14, 2025, DEA investigators spotted a SmartCareRx employee handing a "small red envelope" to someone in a car. Suspension Order at 7. Investigators suspected that same someone of drug trafficking. *Id.* Five days later, DEA investigators stopped the same car for a traffic violation and recovered a similar envelope during the stop. *Id.* The envelope contained opioids. *Id.* Further investigation revealed that SmartCareRx bought and received those same opioids the day before, on March 18. *Id.* From these clues, the DEA deduced that SmartCareRx "simply engaged in a drug deal" during the March 14 parking lot handoff. *Id.* This theory suffers from a notable flaw. How could SmartCareRx supply someone with drugs on March 14, when it supposedly purchased those drugs four days later? The DEA does not say.

On top of this, the "fictitious patients" that SmartCareRx allegedly supplied raise questions. *Id.* at 4. The DEA lists many individuals—only by initials—"who have no associated public records" yet purchased prescriptions from SmartCareRx. *Id.* This list, it asserts, suffices to show that SmartCareRx sold drugs to "fictitious patients" in violation of the law. *Id.* That explanation is more cryptic than "cogent[]." *See Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 48 (1983). If these patients were "fictitious," why would the DEA need to shield their (fake) identities? *Cf. Aaronson v. Dep't of Justice,*

12

--- F. Supp. 3d ---, 2026 WL 482529, at *9 (D.D.C. 2026) (finding no personal privacy interest in a pseudonym).  Indeed, by refusing to provide these patients' names to SmartCareRx, the DEA left little means of rebutting their non-existence.  Pl.'s Mot. at 7 n.1; *see generally* Yee Decl.. ECF No. 23-4; PI Hr'g Tr. at 17:08–17:10.  But SmartCareRx tried anyway, and its own investigations revealed numerous potential public records matches for the DEA's profiles, undermining its claims that those patients do not exist.  *See id.* at 15:11–16:13.  The DEA has offered no refutation to SmartCareRx's investigation, let alone shown that SmartCareRx was on notice that these customers may be ne'er-do-wells.  The anonymous false-patient list is thus shaky ground for suspending SmartCareRx's registration.

Last, the DEA fails to explain why a narrower suspension would not have sufficed. SmartCareRx's Order revoked its registration for *all* controlled substances.  *See* Suspension Order at 2.  But that same Order faulted SmartCareRx for its handling of only three controlled substances: oxycodone, hydromorphone, and promethazine with codeine.  *See id.* at 4–7.  The DEA could have, in compliance with its regulation, limited its Order's reach "to the particular controlled substance, or substances, with respect to which grounds for revocation or suspension exist."  21 C.F.R. § 1301.36(c) (permitting limited suspensions).  Why would an order tailored to those three drugs not work?  The DEA's "failure" to explain why it opted against this "available[]" alternative in its ISO is another strike against it.  *See Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 815 (D.C. Cir. 1983).

Put together, the DEA's Order leaves too many unanswered questions to form "a satisfactory explanation" for its imminent danger finding.  *El Rio Santa Cruz Neighborhood Health Ctr. v. Dep't of Health & Hum. Servs.,* 396 F.3d 1265, 1276 (D.C. Cir. 2005) (cleaned up).  The Court acknowledges the DEA's important regulatory functions in investigating illegal

13

drug trafficking, but the agency must still justify its actions. It could have supported its findings in briefings, affidavits, or testimony, but it never did so. *See Doraiswamy v. Sec'y of Lab.*, 555 F.2d 832, 842 (D.C. Cir. 1976).

**ii.**

Next is SmartCareRx's due process claim. SmartCareRx claims the DEA violated its Fifth Amendment right to due process by denying it a satisfactory hearing about the registration revocation. Pl.'s Mot. at 20. SmartCareRx is also likely to succeed on this claim.

The Fifth Amendment promises that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in liberty or property." *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 117 (D.C. Cir. 2010) (cleaned up). "Only after finding the deprivation of a protected interest do [courts] look to see if the government's procedures comport with due process." *Id.* (cleaned up).

*A. Did SmartCareRx have a due process interest?* To enjoy a due process interest in a government benefit, a plaintiff must have "a legitimate claim of entitlement," not a mere "unilateral expectation." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). SmartCareRx concedes that no binding authority recognizes its entitlement to the registration at issue. PI Hr'g Tr. at 18:08–18:12. Still, the Court concludes that SmartCareRx is likely to succeed on this point.

Generally, a government benefit like a license or registration is "not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005). But courts differentiate between benefit "applicant[s]" and benefit "holder[s]." *See 3883 Connecticut LLC v. District of Columbia*, 336

14

F.3d 1068, 1072 (D.C. Cir. 2003) (emphases omitted).  Once individuals possess a license or other benefit, "the question is no longer whether the government had broad discretion over whether to grant or deny [the] license in the first place." *Scotts Valley Band of Pomo Indians v. Burgum*, 808 F. Supp. 3d 1, 24 (D.D.C. 2025) (cleaned up).

Instead, the inquiry focuses on officials' discretion to revoke the license.  *3883 Connecticut*, 336 F.3d at 1072.  When that discretion is constrained, courts recognize the license holder's due-process interest.  *See, e.g.*, *id.* at 1073 (finding a property interest in building permits where officials could revoke them only under five circumstances); *Barry v. Barchi*, 443 U.S. 55, 64 (1979) (finding a due-process interest where official could suspend a horse trainer's license only after showing his horse was drugged and the owner negligently failed to prevent the drugging).  In contrast, there is no property interest when officials may revoke a benefit at will. *See, e.g.*, *Bishop v. Wood*, 426 U.S. 341, 345–47 (1976) (rejecting a claimed property interest in continued employment because state law instructed that the plaintiff held his position at the "will and pleasure of the city" (cleaned up)); *Lopez v. FAA*, 318 F.3d 242, 248–49 (D.C. Cir. 2003) (denying a claimed property interest in a plaintiff's status as "Designated Engineering Representative" where the status was rescindable wholly "at the FAA's discretion").

SmartCareRx's controlled substance registration lands on the side of cases recognizing a due process interest.  The registration functioned like a license or permit.  Once the DEA issued it, SmartCareRx could buy, distribute, and dispense controlled substances.  *See* Suspension Order at 4.  At that point, SmartCareRx had a property interest in its registration if the DEA's discretion to rescind it was "constrained sufficiently to give [SmartCareRx] an expectation in [its] continued effect." *See 3883 Connecticut*, 336 F.3d at 1073.

Section 824 provides those constraints.  In general, the DEA must base a registration

15

revocation upon one of several reasons listed in 21 U.S.C. § 824(a). To provide a flavor, a finding that a registrant "materially falsified" his application, is "convicted of a felony," or already had his registration suspended "by competent State authority" all could justify revoking a registration. *See* 21 U.S.C. § 824(a)(1)–(3). Most relevant here, of course, the DEA may immediately revoke a registration upon a showing of "imminent danger to the public health or safety." *Id.* § 824(d). Under any path, statutory authority reigns in the DEA's discretion, giving pharmacies reason to think their registrations will typically continue in effect. The DEA cannot revoke a registration whenever it pleases, but only after making one of these showings. Without any sign that "Congress authorized the agency to rescind" the registration "at will," *Scotts Valley*, 808 F. Supp. 3d at 25, the DEA must rescind it consistent with due process.

B. *Did the DEA violate SmartCareRx's due process rights?* Once its protections kick in, the Due Process Clause demands "notice and [an] opportunity for [a] hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (cleaned up). Sometimes, post-deprivation hearings satisfy due process, but only in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993) (cleaned up). In that event, the post-deprivation hearing still must satisfy balancing under *Mathews v. Eldridge*, 424 U.S. 319 (1976), which requires courts to consider: (1) the private interests at stake; (2) the risk of erroneous deprivation of those interests posed by existing procedures and the probably value of further safeguards; (3) and the government's interest. *Id.* at 335.

Even assuming the DEA owed no pre-deprivation hearing, SmartCareRx likely has shown a due process violation. The ISO promised SmartCareRx a post-deprivation hearing. *See*

16

Suspension Order at 8; 21 C.F.R. § 1316.47.  And due process required that hearing come "prompt[ly]," "proceed and be concluded without appreciable delay."  *See Barry*, 443 U.S. at 66.  But the record and the parties' representations confirm that a hearing is nowhere in sight.  In mid-January, SmartCareRx requested a hearing.  Hearing Request at 2, ECF No. 23-5.  Two months since that request, and three months since the DEA revoked SmartCareRX's registration, none has been scheduled—much less occurred.  *See* Agency Response at 2, ECF No. 23-7; Pl.'s Mot. at 8; PI Hr'g Tr. at 14:03–14:12.

The DEA has no idea of when one might occur either.  In fact, until recently, agency counsel did not know that the DEA had *any* ALJs who could hear this case.  At the motion hearing, SmartCareRx asserted that the DEA lacked a single ALJ, and the DEA agreed.  PI Hr'g Tr. at 24:23–24:25.  It offered only that "hiring qualified ALJs is a time-consuming process," *id.* at 28:09–29:10, and that "there's no guarantee of the timeline of this process," *Id.* at 27:22.  Several days after that hearing and long since briefing concluded, agency counsel discovered that there is in fact a recently-appointed acting ALJ.  *See* Defs.' Notice at 1, ECF No. 29.  The DEA's confusion about its personnel does not instill confidence in getting a hearing scheduled soon.

All of this makes for simple *Mathews* balancing.  As long as it remains in limbo, SmartCareRx "suffer[s] the full penalty imposed" by the ISO as it loses customers, physicians, and potentially employees.  *Barry*, 443 U.S. at 66; Thumu Decl. ¶¶ 3, 6, 8.  Meanwhile, the Court sees little governmental interest in a further delayed hearing, and the DEA has suggested none.  *Barry*, 443 U.S. at 66.  Simply put, SmartCareRx's interest in a prompt hearing is strong, and the DEA's interest in further delay is weak.  *See Mathews*, 424 U.S. at 334.  And given SmartCareRx's lack of other opportunity "to put the [DEA] to its proof," *see Barry*, 443 U.S. at 66, coupled with the questionable grounds for the revocation, *see supra* Section III.A.i., the risk

17

of an erroneous deprivation of SmartCare's registration also tilts in its favor, *see Mathews*, 424 U.S. at 335. With only the promise of a post-deprivation hearing at some unknown time, SmartCareRx is likely to succeed on its claim.

### iii.

The DEA resists these conclusions mostly at the threshold. It contends the ISO is not sufficiently "final" under the APA. *See* 5 U.S.C. § 704. Whether the Order is final or not makes no difference. Section 704 allows judicial review for "final agency action[s]" *and* for "[a]gency action[s] made reviewable by statute." *Id.*; *Lodge 1858, Am. Fed'n of Gov't Emp. v. Paine*, 436 F.2d 882, 890 n.51 (D.C. Cir. 1970) (explaining that the APA "provides for judicial review, *not only* of 'agency action made reviewable by statute,' but also of 'final agency action for which there is no other adequate remedy in a court'" (emphasis added)); *Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 638 (6th Cir. 2004) ("[F]ederal courts may review two types of agency actions: [1] Agency action made reviewable by statute and [2] final agency action for which there is no other adequate remedy in a court." (cleaned up)). Recall that 21 U.S.C. § 824 blesses judicial review of the ISO at issue. *See supra* Section II. That suffices to open § 704's doors.

The DEA also contends that revoking SmartcareRx's permit is a decision committed to agency discretion and is thus unreviewable. To be sure, 21 U.S.C. § 824(d) permits the DEA Administrator to, "in his discretion," suspend registrations. But stopping there would ignore the rest of § 824(d), which confines that discretionary authority to circumstances presenting an "imminent danger to the public health or safety." The word "discretion" does not alone render the DEA's action nonreviewable. *See Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985). The action becomes unreviewable only if the statutory scheme "provides absolutely no guidance as to how that discretion is to be exercised." *Id.* Section 824(d) provides the requisite guidance. The

18

DEA's argument also ignores the rest of § 824(d), which explicitly authorizes judicial review.

On the substance, the DEA says nothing about SmartCareRx's arbitrary and capricious claim. What little it says about the due process claim proves unpersuasive. First, it argues it owed no due process because SmartCareRx's registration "is a privilege granted in a highly regulated field," which the DEA "maintains broad discretion to revoke." Defs.' Opp'n at 18. But this barebones argument never meaningfully addresses § 824's limits on that discretion. *See supra* Section III.A.ii. And the only authorities the DEA cites are not on point. *See PDK Labs Inc. v. Reno*, 134 F. Supp. 2d 24, 32, 34 (D.D.C. 2001) (rejecting a registration *applicant's*, rather than a registration *holder's*, property interest in that registration); *see Roth*, 408 U.S. at 578 (finding no property interest where there was no "state statute or University rule or policy that secured [the plaintiff's] interest in re-employment or that created any legitimate claim to it" (cleaned up)).

Second, it argues that the "procedures provided by the Act" satisfy due process. Defs.' Opp'n at 19. It may be true that the Controlled Substance Act's hearing scheme for ISOs satisfies due process. But this case's due process problems do not flow from what the Act says. They stem from what the DEA has failed to do. Without a hearing or a plan for one, the DEA flouts due process. Focusing on the Act instead of the DEA's actions will not help its cause.

\* \* \*

For these reasons, SmartCareRx has shown a likelihood of success on the merits.

**B.**

Though a closer question, SmartCareRx has also shown that without narrowly tailored preliminary relief, it will face irreparable harm. Parties seeking a preliminary injunction must identify an irreparable harm that is "certain and great," "actual and not theoretical," and so

19

"imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm." *League of Women Voters v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (cleaned up).  The harm must also be "beyond remediation." *Id.* (cleaned up).

Because "[i]njury to reputation or goodwill is not easily measurable in monetary terms," it is often "viewed as irreparable."  Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.); *see Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 38 (2d Cir. 1995) ("[W]e hold that a loss of prospective goodwill can constitute irreparable harm."); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) ("The loss of customer goodwill often amounts to irreparable injury . . . .").  Still, to meet the irreparable harm standard, "the plaintiff must make a showing that is concrete and corroborated, not merely speculative." *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 104 (D.D.C. 2017) (cleaned up).

SmartCareRx has done so.  Since the ISO revoked its registration, SmartCareRx has "lost hundreds of customer profiles."  Thumu Decl. ¶ 8.  Physicians call "almost daily" about the difficulties they face delivering certain medications to their patients now that SmartCareRx cannot provide them.  *Id.* ¶ 3.  SmartCareRx "is no longer listed on various websites as a preferred . . . provider."  *Id.* ¶ 6.  As physicians and patients take their business elsewhere, SmartCareRx is "losing the good will" that it "buil[t] over the past five years."  *Id.* ¶ 3.  It expects that the longer its "registration is suspended, the more customers [will] transfer their prescriptions to other pharmacies."  *Id.* ¶ 8.  These losses have costly effects.  As SmartCareRx puts it "[t]rust in the medical industry is hard earned, and the damage to [its] reputation and customer base has been devastating."  *Id.*

These "concrete," non-"speculative" harms, set to worsen as the ISO lingers, adequately show irreparable harm.  *See Atlas Air*, 280 F. Supp. 3d at 104 (cleaned up).

20

If loss of goodwill were not enough, SmartCareRx also adds economic harm to the mix. It cites "unrecoverable revenue" that it expects to worsen as it remains unable to dispense controlled substances. Pl.'s Mot. at 23. It now "fear[s]" that with the Order's continued impact to its "business," it "will have to begin laying off employees." Thumu Decl. ¶ 3. Such a change "would have a catastrophic impact on the morale of the Pharmacy and change the culture of [its] business." *Id.*

Generally, "economic loss does not, in and of itself, constitute irreparable harm." *John Doe Co. v. CFPB*, 849 F.3d 1129, 1134 (D.C. Cir. 2017) (cleaned up). That is especially true in cases like this one, where SmartCareRx has not alleged that economic loss from the ISO "threatens the very existence" of its business. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). But because sovereign immunity would likely render any damages unrecoverable, *see* 5 U.S.C. § 702 (waiving sovereign immunity only for "relief other than money damages"), SmartCareRx's economic loss claim has more bite, *see Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 77 n.19 (D.D.C. 2010), and further buttresses the pharmacy's irreparable harm claim.

Topping off these harms, lest one forget, is the DEA's failure to schedule, much less to hold, any administrative hearing. Without a hearing in sight, continued, and perhaps worsening, harm to SmartCareRx's reputation and business appears likely. Altogether, SmartCareRx has established irreparable harm.

The DEA's counterarguments do not persuade. It claims that SmartCareRx points to injuries to its patients, not to itself, to establish irreparable harm. *See* Defs.' Opp'n at 21. True, injuries to third parties "do[] not satisfy the irreparable harm requirement." *Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021). But SmartCareRx focuses on its own loss of goodwill and

21

its own economic harms.  *See, e.g.*, Thumu Decl. ¶¶ 3, 6, 8.  Patient and physician fallout is a mere consequence of the harm SmartCareRx itself faced.

On economic and reputational harm, the DEA argues that SmartCareRx has not done enough.  SmartCareRx's claim about economic harm, as the DEA sees it, is "attenuated," "speculative," and comprised of "bare allegations."  Defs.' Opp'n at 22–23.  And SmartCareRx's claims about reputational harm "offer[] nothing more than . . . legal arguments" and "conclusory statements that its reputation has suffered."  *Id.* at 23.  The Court agrees that irreparable harm indeed imposes a high standard for both economic and reputational loss, *see Wis. Gas*, 758 F.2d at 674 (economic harm); *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018) (reputational harm).  The Court also agrees that SmartCareRx could have done more to detail the injuries it faces and finds that irreparable harm presents a closer call than the merits.  But SmartCareRx's description of the sudden decline it is experiencing just manages to clear the bar, *see supra*, especially considering the cumulative harms SmartCareRx faced and the uncertain timeline for administrative proceedings.

## C.

Turning to the last preliminary injunction factors, the balance of the equities and the public interest favor a narrow preliminary injunction order.  *See Winter*, 555 U.S. at 26.  Because these factors "merge" when the government is the opposing party, *Nken*, 556 U.S. at 435, the Court considers them together.

Here, SmartCareRx faces "devastating" loss of consumer goodwill, revenue, and maybe even employees.  Thumu Decl. ¶¶ 3, 6, 8.  Preliminary relief poses comparatively little hardship to the DEA.  Indeed, SmartCareRx has conceded that it remains "willing and ready to voluntarily cease distribution of any oxycodone, hydromorphone, and promethazine with codeine"—the

22

three drugs prompting the ISO—"during the pendency of the administrative hearing."  Pl.'s Mot. at 25.  By stopping distribution of the only controlled substances the DEA cited as a source of "imminent danger," *see* Suspension Order at 6–7, SmartCareRx will mitigate the harm at the core of the DEA's concerns.  More, the DEA holds the key to the end date on preliminary relief.  This preliminary injunction will dissolve whenever the DEA issues a final determination.  Presumably, the DEA could move quickly and issue one within weeks.

And though the public has a weighty interest in controlling the improper distribution of controlled substances, SmartCareRx's voluntary cessation serves this very interest.  Indeed, preventing SmartCareRx from distributing *all* controlled substances to its customers when the DEA's evidence focuses only on three such substances may hurt those members of the public who rely on SmartCareRx to fill their prescriptions for other drugs.  *Accord Holiday CVS, L.L.C. v. Holder*, No. CV 12-0191 (RBW), 2012 WL 10973832, at *2 (D.D.C. Feb. 7, 2012) ("Preventing the two pharmacies from filling these prescriptions would inure to the detriment of sick and elderly patients who are used to filling their prescriptions there and could have trouble moving elsewhere.").

### D.

Finally, the DEA asks the Court to require SmartCareRx to post a bond as a condition of receiving preliminary relief.  Defs.' Opp'n at 25.  The Court will require a bond of $30,000.

Under Federal Rule of Civil Procedure 65(c), courts "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  As the D.C. Circuit recently clarified, "injunction bonds are generally required" no matter how much the preliminary injunction factors favor injunction.  *NTEU v. Trump*, No. 25-

23

5157, 2025 WL 1441563, at *3 (D.C. Cir. May 16, 2025) (per curiam); *see also Monzillo v. Biller*, 735 F.2d 1456, 1461 (D.C. Cir. 1984) ("Rule 65(c) of the Federal Rules of Civil Procedure requires the filing of a security bond by a party who benefits from a . . . preliminary injunction."). That said, district courts have "broad discretion" when setting the amount of the required bond. *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).

The DEA asserts that preliminary relief would "potentially mandate" that it "spend money that may not be recouped once distributed." Defs.' Opp'n at 25. SmartCareRx suggested an appropriate bond would be $30,000. PI Hr'g Tr. at 52:17–52:18. Because the DEA has provided no reason to think $30,000 would be insufficient, the Court sets bond at that amount.

**IV.**

In closing, the Court emphasizes the narrowness of the preliminary injunction it imposes. The injunction will not touch the suspension relating to those controlled substances that were allegedly misused. And it will terminate upon the DEA's final determination of the show cause order, meaning that the duration of the injunction is controlled by the DEA's own willingness to move expeditiously. This injunction thus balances the DEA's appropriate interests in safeguarding the public with SmartCareRx's legitimate interests in carrying out its business.

For all these reasons, it is **ORDERED** that Plaintiff's [23] Renewed Motion for Preliminary Injunction is GRANTED IN PART; and it is further

**ORDERED** that

1. The DEA's Immediate Suspension of Registration of Plaintiff's Certification of Registration No. FA9956941 is **ENJOINED** except with respect to oxycodone, hydromorphone, and promethazine with codeine.

2. Defendants shall return any registrations, licenses, or forms to SmartCareRx to make this

24

Court's preliminary injunction effective.

3.  Defendants are directed to return or unseal controlled substances seized or placed under seal in connection with the Immediate Suspension Order.  This directive does not apply to the three controlled substances mentioned above.

4.  This preliminary injunction shall remain in effect until the DEA issues a final determination.

5.  As a condition of obtaining the relief this Order describes, SmartCareRx shall promptly post an injunction bond with the Clerk of Court in the amount of $30,000 in accordance with Federal Rule of Civil Procedure 65(c).  This Order granting preliminary relief will dissolve automatically if the required injunction bond is not posted on or before April 6, 2026.

**SO ORDERED.**

---

Dated: March 23, 2026                                    TREVOR N. McFADDEN, U.S.D.J.